# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

LANDMARK AMERICAN INSURANCE
COMPANY,

      Plaintiff/Counter-Defendant,


ARCH INSURANCE GROUP,

      Intervenor/Plaintiff/Counter-Defendant,


v.                                       Case No. 3:05cv401/LAC

MOULTON PROPERTIES, INC.,
MOULTON BROTHERS, INC., and
THE MOULTON TRUST,,

      Defendant/Counter-Plaintiffs,
_____/

## ORDER ON SUMMARY JUDGMENT

THIS CAUSE is before the Court on a Motion for Judgment on the Pleadings (doc. 436) and for Partial Summary Judgment (doc. 437) filed by Defendant/Counter-Plaintiff Moulton Properties, Inc., et al., ("the Moultons"), and on Motions for Summary Judgment filed by Plaintiff/Counter-Defendant Landmark American Insurance Company ("Landmark") (doc. 451) and Intervenor/Plaintiff/Counter-Defendant Arch Insurance Group ("Arch") (doc. 450). Memoranda and evidentiary materials in opposition have been filed by all parties in support. Additionally, the Moultons filed a Revised Motion in Limine (doc. 460).

# I. Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). "[T]he substantive law will identify which facts are material" and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). An issue of fact is material if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case. *See id.*

At the summary judgment stage, a court's function is not to weigh the evidence to determine the truth of the matter, but to determine whether a genuine issue of fact exists for trial. *See id.* at 249, 106 S. Ct. at 2510–11. A genuine issue exists only if sufficient evidence is presented favoring the nonmoving party for a jury to return a verdict for that party. *See id.* "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust Co. v. Fidelity and Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)).

When assessing the sufficiency of the evidence in favor of the nonmoving party, the court must view all the evidence, and all factual inferences reasonably drawn from the

evidence, "in the light most favorable to the non-moving party." *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918 (11th Cir. 1993). The court is not obliged, however, to deny summary judgment for the moving party when the evidence favoring the nonmoving party is "merely colorable or is not significantly probative." *Anderson*, 477 U.S. at 249–50, 106 S. Ct. at 2511. "A mere 'scintilla' of evidence supporting the . . . [nonmoving] party's position will not suffice" to demonstrate a material issue of genuine fact that precludes summary judgment. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (quoting *Anderson*, 477 U.S. at 252, 106 S. Ct. at 2512).

## *II. Background*

At issue in this cause of action is whether the Moultons are entitled to insurance coverage for properties owned by them which were damaged when Hurricane Dennis struck the Pensacola, Florida, area in 2005. Landmark, which issued the primary policy, and Arch, which issued the excess policy, rescinded coverage because of alleged material misrepresentations made by the Moultons regarding the condition of the properties following Hurricane Ivan's arrival the year before and the extent of monetary damages caused by Ivan.

After Hurricane Ivan struck the Pensacola area in September 2004, the Moultons filed an insurance claim with their carrier, St. Paul/Travelers (St. Paul), for damages sustained to its various properties. In March of 2005, while the claim process was still underway, St. Paul advised the Moultons that it would no longer provide insurance coverage for the properties

in question. The Moultons enlisted Fisher-Brown, Inc. (Fisher-Brown), an insurance agent whom they had been associated with for several years, to find a new insurance carrier.

In April of 2005, Fisher-Brown began submitting applications to several insurance carriers. After some carriers declined to issue coverage, in June of 2005 Fisher-Brown sought the assistance of Peachtree Special Risk Brokers, LLC (Peachtree), an independent insurance broker who would help in procuring coverage from "surplus lines carriers." To that end, Fisher-Brown employee Valerie Smith submitted an insurance application to Peachtree on behalf of the Moultons. The application indicated an "open" claim for Hurricane Ivan but did not include any specific monetary amounts of what was either paid or held in reserve by St. Paul on the claim. After reviewing the application, Peachtree employee Patricia Jo Berry solicited and received additional information during the following e-mail exchange:

> **From:        Patti Berry**
> **Sent:        Tuesday, June 07, 2005 8:21 AM**
> **To:          Smith, Valerie**
> **Subject:     Moulton Brothers**
>
> **Val,**
>
> **Per my voice mail, please advise:**
>
> > **• 5 year loss history**
> > **• Current carrier?**
>
> **Best Regards,**
> **Patti**

_____

From:          **Smith, Valerie**
Sent:          **Tuesday, June 07, 2005 10:07 AM**
To:           **Patti Berry**
Subject:      **RE: Moulton Brothers**

**Patti, the current carrier is St. Paul/Travelers under a BOP and they are non-renewing due to a change in their property position in Florida.**

**The only property losses would be Ivan and all their properties sustained damage. The damage has been fixed other than cosmetic work on some properties. Until Ivan their property loss experience was excellent.**

**If you need anything else please advise.**

**Thanks.**
**Val**

_____

From:          **Patti Berry**
Sent:          **Tuesday, June 07, 2005 9:07 AM**
To:           **Smith, Valerie**
Subject:      **FW: Moulton Brothers**

**Val, do you have the damage $$ from Ivan?**

_____

From:          **Smith, Valerie**
Sent:          **Tuesday, June 07, 2005 9:19 AM**
To:           **'Patti Berry'**
Subject:      **RE: FW: Moulton Brothers**

**We don't have any specific figures. St. Paul is handling the claim on all the properties (not just what we have submitted to you) and they are still working it out. When I spoke to the St. Paul underwriter when we were discussing the non-renewal he did mention that they had reserve set up of 2.2**

**million for all the properties.  If you need anything else please let us know.**

**Thanks.**
**Val**

Doc. 448, Ex. A-11 (Order of e-mails reversed for sake of clarity as originals were in reverse chronological order).

Based on this information, and evidently on June 7, 2005, the same day as the e-mail exchange detailed above, Ms. Berry forwarded a "Property Summary" to several carriers, including Landmark and Arch.  The "Property Summary" contained rudimentary descriptions of the properties, their values and map locations, and contained the following statement:

> **"Losses: IVAN – all repairs have been completed, the total loss (on the master program which includes several buildings that are not on our schedule – total loss was estimated @ $2.2MM)."**

Doc. 448, Ex. A-12.

On June 14, 2005, Landmark submitted a written quote to Peachtree for the Moulton properties which stated, "our quote is subject to all damage from Ivan being completed and subject to no damage from Arlene."  Doc. 448, Ex. A-53A.[1]  On the same day, Arch sent Fisher-Brown a quote for its surplus lines policy, its packet containing the Landmark policy as well.  Doc. 448, Ex. A-53.  The Moultons agreed to purchase the primary policy offered by Landmark and the excess policy offered by Arch, and on June 29, 2005, both Arch and

---

[1]  Landmark's quote was actually issued by RSUI Group, Inc., on Landmark's behalf.  Arlene refers to Tropical Storm Arlene, which was active in the greater Pensacola area during the time the quote was being offered.  Arlene evidently caused no damage to the properties in question.

Landmark issued binders for coverage. Landmark's binder reiterated that "our quote is subject to all damage from Ivan being completed and subject to no damage from Arlene." Doc. 448, Ex. A-13. The policy issued by Landmark contained an "Endorsement No. 1" which stated: "In consideration of the premium charged, it is hereby agreed coverage from this policy is subject to all damage from Hurricane Ivan being completed prior to inception of policy. It is further agreed that coverage from this policy is subject to no damage from the Named Storm Arlene." Doc. 448, Ex. A-15.

Both policies took effect on July 1, 2005. On July 10, 2005, Hurricane Dennis struck the Pensacola area, and on or about July 11, 2005, the Moultons reported damage from Hurricane Dennis at some of the properties protected under the Landmark and Arch policies.[2] Upon receipt of the claim, Landmark and Arch hired Engle Martin and Associates, Inc., as an adjuster.

After an initial inspection of the properties conducted on July 13, 2005, William Lancaster of Engle Martin reported that he had observed unrepaired damages from Hurricane Ivan at the Moulton properties. Lancaster's understanding was that the Moultons were still involved in a dispute with St. Paul over the Hurricane Ivan claim and, perhaps because the Moultons had yet to receive payment from St. Paul on the policy, some of the repairs were temporary in nature.

---

[2] Claims were initially made on properties owned by the Moultons at the following locations: (1) 3355 Gulf Breeze Parkway; (2) 3371 Gulf Breeze Parkway; and (3) 2800 Gulf Breeze Parkway. The Moultons later reported damages to their property located at 25 West Cedar Street, but they subsequently withdrew this property from the claim.

Satisfied after further investigation that there were several aspects of the subject properties that were either temporarily repaired or otherwise not completely repaired from Hurricane Ivan, Landmark and Arch believed this to have constituted a breach of the insurance policy and a misrepresentation or concealment of material facts during the underwriting process. Accordingly, on July 29, 2005, Landmark forwarded a "Reservations of Rights" letter to the Moultons stating there were issues with the Moultons' claims and requesting further information relating to the repairs from Ivan. Doc. 448, Exhibit A-57. On August 15, 2005, Landmark sent another letter to the Moultons, stating its belief that the Moultons had made misrepresentations concerning the Hurricane Ivan damages and repairs, and that therefore, unless the Moultons could show it made no misrepresentations, Landmark was entitled to rescind the policy and deny coverage for the Hurricane Dennis claim. Doc. 448, Exhibit A-58. As counsel for the Moultons, Philip Bates responded days later that the Moultons would submit documentary proof regarding the alleged misrepresentation, and the parties ultimately agreed to a September 13, 2005, deadline for such proof. Doc. 448, Exhibits A-59, A-61.

On September 13, 2005, Bates sent a letter denying Landmark's contentions regarding the Ivan repairs. The letter contained the following outline of the cost of repairs made to the properties in question as of September 1, 2005:

> 3371 Gulf Breeze Parkway: $166,451.81
> 3355 Gulf Breeze Parkway: $142,085.43
> 2800 Gulf Breeze Parkway: $419,171.94

Doc. 448, Exhibit A-21.  Landmark noted that these figures were substantially less than those claimed in the Proof of Loss Statements that the Moultons submitted to St. Paul in May of 2005:

> 3371 Gulf Breeze Parkway: $1,120,990.87
> 3355 Gulf Breeze Parkway:   $991,621.46
> 2800 Gulf Breeze Parkway: $1,098,150.61

By Settlement Agreement dated October 21, 2005, the Moultons and St. Paul agreed upon a damage settlement in the amount as to all of the Moulton properties of $9,268,511.55 before application of the deductible, which reduced the total to $8,18,760.04.  Doc. 448, Exhibit A-5.  Landmark and Arch calculated approximately $3.5 million as the portion of the total amount related to the three properties identified above.[3]

By letter dated October 20, 2005, Landmark informed the Moultons that it had decided to rescind the insurance policy, based upon its determination that the property repairs were not completed prior to the effective date of the policy, which ran contrary to Endorsement No. 1 of the policy.  Landmark also concluded that the Moultons had misrepresented that all damages from Hurricane Ivan had been fully repaired and that they had misrepresented that the total loss to the properties from Ivan was 2.2 million dollars.  In a letter dated November 29, 2005, Arch notified the Moultons that it was rescinding its policy for essentially the same reasons.  Doc. 448, Exhibit A-24.  Landmark then initiated this lawsuit, seeking a declaratory judgment as to its right to rescind the insurance policy; Arch

---

[3]  The Moultons had coverage with St. Paul for numerous properties throughout the Pensacola area, many of which were affected by Hurricane Ivan.

subsequently intervened, seeking similar declaratory relief. The Moultons filed a counterclaim for breach of contract, based on Landmark and Arch's failure to provide coverage under the policy.

## III. Discussion

The Court will first address Landmark and Arch's arguments in support of their summary judgment motions.

## BREACH OF CONTRACT

Landmark and Arch first contend that the Moultons, in failing to fully repair the damage to their properties from Hurricane Ivan prior to the inception of the Landmark and Arch policies, failed to meet a condition precedent of the insurance contract, and that therefore the policy is void *ab initio*. This argument derives from the language of Endorsement No. 1 of the Landmark policy, "In consideration of the premium charged, it is hereby agreed coverage from this policy is subject to all damage from Hurricane Ivan being completed prior to inception of policy," as well as the substantially identical statements expressed in Landmark's written quote and binder.[4] The Moultons reply that, according to the plain language of the Endorsement, they are not in violation.

---

[4] While Arch's excess insurance policy does not contain a similar endorsement, the policy incorporates the Landmark policy by reference. The parties contest whether this is sufficient for Arch to be able to assert this breach of contract claim, but in light the Court's ruling, resolution of this issue is unnecessary.

Under Florida law, insurance contracts ordinarily must be construed in accordance with the plain language of the policy. *See Swire Pacific Holdings, Inc. v. Zurich Ins. Co.*, 845 So.2d 161, 165 (Fla. 2003). If the policy language can be reasonably interpreted in more than one way, it is considered ambiguous, and in that event the ambiguity is construed in favor of the insured and strictly against the drafter. *Id.* However, insurance policies should not be interpreted in a manner that would lead to an absurd result. *Deni Assocs. of Florida, Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So.2d 1135, 1140 (Fla. 1998). In construing contract terms, courts should be careful to not "rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties."*Id.* (quoting *Excelsior Ins. Co. v. Pomona Park Bar & Package Store*, 369 So.2d 938, 942 (Fla. 1979)). A court should not overlook the plain language of the contract merely because it thinks it should have been drafted differently. *See Deni*, 711 So.2d at 1139. A contract provision should not be found ambiguous simply because it is complex and requires analysis for its application. *See Swire*, 845 So.2d at 185.

Upon review, the Court finds plain meaning in the terms of the Endorsement, that coverage was subject to all damages being completed before the effective date of the policy. The keyword for the parties being "damage," Landmark and Arch declare the word to actually mean that "repairs" needed to be completed. As the Moultons point out, "damage" and "repairs" are certainly different words, each with a distinct meaning. Landmark and Arch do not argue directly against this point, but rather they state that the idea of requiring

damages to be completed is absurd or nonsensical because such a provision would be pointless. They assert that damages caused by a storm are by definition completed once the storm has passed through, and so to include a provision requiring damages to be complete months after the passage of the storm would be meaningless. The Court does not agree as there are types of damage that may accrue after a storm passes. For example, molds may later grow in areas that have been dampened by the storm, or structures may get weakened in a manner that may not even be detected but nevertheless accelerate the deterioration of the integrity of the structure. These are the kinds of ongoing damages that even Arch's own official, Nathan Warde, recognized as problematic in the aftermath of a storm. Doc. 447, Exhibit B-17 at 69. Accordingly, the Court rejects the argument that the Endorsement, taken literally on its face, lacks plain meaning.

Curiously, while Landmark and Arch argue against the plain meaning of the language on this ground, they do not state that the meaning is in any way ambiguous. They seem to argue that the word "repairs" should simply be inserted for "damage," unambiguously as it were, to arrive at the correct meaning. Nor for that matter do they explain why "repairs" should be the replacement word and not some other word that might also logically fit. In essence, they ask to be rewarded with a construction of the provision most meaningful to them simply because they drafted what they now conclude to be a facially absurd provision. Perhaps in avoidance of this very problem, they seem to argue that it is the Moultons who are guilty of the absurdity for insisting that the meaning of "damage completed" be taken literally

or at face value, while their own substitution of "repairs completed" for "damage completed" is the natural translation.[5]  In any event, because the Court does not find the provision to be facially absurd or ambiguous, Landmark and Arch's invitation to convert "damage" into "repairs" must be rejected.[6]

Accordingly, the Court finds there to be no competent evidence or other indication that the damage wrought by Hurricane Ivan was not completed at the time the policy became effective.  Therefore, the Moultons do not stand in violation of Endorsement No. 1, and there is no breach of contract such that Landmark and Arch are entitled to rescission.

---

[5]  In this regard, the Court cannot help but notice that, as far as it can recollect throughout its review of the voluminous pleadings, whenever Landmark or Arch addressed the issue of whether repairs to the properties had been completed, they in fact used the term "repairs" and never "damage."  While this is by no means a scientific or statistical survey, it does tend to further deflate the implication that one effortlessly or automatically translates "damage" into "repairs" in this situation, or that the terms are interchangeable. It should also be mentioned that it is clumsy or inartful to speak of "damage" being "completed."  But while the Court supposes that the statement could be better crafted, this does not render the present reading of the statement absurd.

[6]  The Court also notes that Landmark and Arch consistently required during the contracting process that policy coverage be "subject to no damage from the named storm Arlene."  The Court finds this statement to be consistent with a plain reading of the Endorsement as well, and it therefore lends further support to the Court's finding.  While neither Landmark nor Arch explain why they required the Ivan damage to be completed but the Arlene damage to be nonexistent, the distinction nevertheless appears to be internally logical.  It would be entirely meaningful for Landmark and Arch, in recognizing the damage done by Ivan, to want assurance that the types of ongoing property damages described above had run their course, while at the same time wishing to avoid the issue of damage from Arlene in its entirety because of the possible difficulties in parsing out which damage resulted from which storm.  Of course, while this might not have been the actual intentions of Landmark and Arch, the focus here is not on their thinking or motivation but on whether the endorsement itself makes internal sense.

# *MISREPRESENTATION AND FRAUD*

Landmark and Arch further contend that the Moultons failed to fully repair the damage to their properties from Hurricane Ivan prior to the inception of the Landmark and Arch policies, yet represented to Landmark and Arch that they had done so. Further, they contend that the Moultons misrepresented to them the amount of the damages related from their insurance claim with St. Paul for Hurricane Ivan. Landmark and Arch assert that, had they received accurate information regarding the status of repairs and the amount of damages, they would not have issued the policy to the Moultons, or they would have altered the terms of the policy. They therefore claim that the Moultons made material misrepresentations in violation of the insurance policy contract and in violation of Florida Statutes, Section 627.409, which entitles them to rescind the policy in its entirety. The Moultons deny making any material misrepresentations.

In Florida, rescission of an insurance policy based on the insured's misstatement or omission during the procurement process is governed by Florida Statutes, Section 627.409 (2005). *See Miguel v. Metropolitan Life Ins. Co.*, 200 Fed.Appx. 961, 965, 2006 WL 2971331 (11th Cir. 2006); *Griffin v. American General Life and Acc. Ins. Co.*, 752 So.2d 621, 623-24 (Fla. 2d DCA 1999). Thus, for an insurer to prove misrepresentations by the insured, it must meet the standards provided by the statute. *See Griffin*, 752 So.2d at 624.

As is relevant here, that section provides:

> (1)  Any statement or description made by or on behalf of an insured or annuitant in an application for an insurance policy or annuity contract, or in negotiations for a policy or contract, is a representation and is not a warranty. A misrepresentation, omission, concealment of fact, or incorrect statement may prevent recovery under the contract or policy only if any of the following apply:
>
> > (a) The misrepresentation, omission, concealment, or statement is fraudulent or is material either to the acceptance of the risk or to the hazard assumed by the insurer.
> >
> > (b) If the true facts had been known to the insurer pursuant to a policy requirement or other requirement, the insurer in good faith would not have issued the policy or contract, would not have issued it at the same premium rate, would not have issued a policy or contract in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss.

Florida Statutes, Section 627.409(1) (2005).

> The policy issued by Landmark reads in relevant part:
>
> This Coverage Part is void in any case of fraud by you as it relates to this Coverage Part at any time. It is void if you or any other insured, at any time, *intentionally conceal or misrepresent a material fact* concerning:
>
> > 1. This Coverage Part;
> > 2. The Covered Property;
> > 3. Your interest in the Covered Property; or
> > 4. A claim under this Coverage Part.

Doc. 448, Exhibit A-15 at 38 (emphasis supplied).

The elements of fraudulent misrepresentation are "(1) a false statement concerning

a material fact; (2) the representor's knowledge that the representation is false; (3) an

intention that the representation induce another to act on it; and, (4) consequent injury by the party acting in reliance on the representation." *Johnson v. Davis*, 480 So.2d 625, 627 (Fla. 1985).

While the statute itself contains no requirement that the misrepresentation be knowing or intentional, parties are free to enter into an agreement that requires that the misrepresentation be intentional since this is more favorable to the insured than what the statute prescribes. *See William Penn Life Ins. Co. of New York v. Sands*, 912 F.2d 1359, 1363-64 (11th Cir. 1990); *Green v. Life & Health of America*, 704 So.2d 1386, 1390 (Fla. 1998). Here, the policy does just that, and consequently it must be found that the Moultons intentionally misrepresented material facts in order for coverage under the policy to be rescinded.[7]

The central focus of Landmark and Arch's misrepresentation claim is on the email communications that took place between Valerie Smith of Fisher-Brown and Patti Berry of Peachtree during the underwriting process as detailed *infra*. Importantly, while Landmark and Arch assert, without opposition from the Moultons, that Valerie Smith acted as an agent

---

[7] The parties differ on the standard of proof required for proving fraud or misrepresentation in this case, and the law does not appear entirely clear in this area. While, as the Moultons point out, caselaw in the area of insurance contracts and policies has historically required clear and convincing (or "conclusive") proof, *see* 31B Fla. Jur 2d Insurance § 3497 (collecting cases), more recently the Florida Supreme Court has stated in more general terms that cases of fraud require proof only by a preponderance of the evidence. *See Wieczoreck v. H & H Builders, Inc.*, 475 So.2d 227, 228 (Fla. 1985) (surveying and resolving conflicting holdings among previous cases). However, while the earlier cases addressed not only fraud but also misrepresentation and concealment, the recent law only addressed matters of fraud, with the concomitant concern that there be consistency between matters of law and matters of equity in fraud cases. Thus, arriving at a uniform burden of proof is difficult in this case. As the Court finds that Landmark and Arch have failed to establish their case even under the lesser preponderance burden, the Court need not definitively resolve this issue.

for the Moultons during these transactions, they do not seriously contend that Peachtree or Patti Berry were agents for the Moultons, whereas the Moultons assert that Peachtree and Berry were in fact agents for Landmark and Arch. Accordingly, neither Peachtree nor Patti Berry are considered agents for the Moultons, and this in turn means that, while Valerie Smith's statements to Patti Berry are considered as representations of the Moultons, Berry's communications with Landmark and Arch are not.

## 1. Repairs

The Moultons' alleged misrepresentation as to repairs derives from Smith's response to Berry's email message requesting that Smith "advise" her as to the "5 year loss history" for the Moulton properties. Smith's email in response stated that Hurricane Ivan was their only property loss, that all their properties were damaged, and that until Ivan their "property loss experience was excellent." These statements appear to address Berry's request for a five year loss history, and while Landmark and Arch's description of the response as "quantitatively and qualitatively less than forthcoming" may be accurate, it is also noted that Smith also wrote "If you need anything else please advise." Berry did ask for more information, but only for damage amounts from Ivan. Although Berry made no request for information about the status of repairs to the properties, Smith stated in her return email that "[t]he damage [from Ivan] has been fixed other than cosmetic work on some properties."

Berry then altered this information somewhat when she forwarded it to Landmark and Arch, representing that "all repairs have been completed."

Critical in this transaction is the fact that Smith's information regarding repairs was not in response to any specific question but was volunteered. Section 627.409 is inapplicable when the allegedly misrepresented information was not solicited by the insurer. *William Penn*, 912 F.2d at 1364 (citing *Independent Petrochemical Corp. v. Aetna Casualty & Sur. Co.*, 674 F.Supp. 354, 357-58 (D.D.C. 1987) and *Roess v. St. Paul Fire & Marine Ins. Co.*, 383 F.Supp. 1231, 1236 (M.D. Fla. 1974)); *see also Boca Raton Community Hosp., Inc v. Brucker*, 695 So.2d 911, 913 (Fla. 4th DCA 1997). As the Eleventh Circuit in *William Penn* explained, this rule prevents situations that "would give insurers the power to play 'Monday morning quarterback,' potentially voiding all policies that prove to have been bad gambles for them, by uncovering some fact – not solicited at the time of the contract's formation – that might have subsequently burgeoned into a claim upon the insurer. The Florida disclosure statute is not intended for such use; its protections are more limited." *William Penn*, 912 F.2d at 1364.

While this Court does not necessarily view Landmark and Arch's actions in this litigation as an attempt to escape payment based upon mere technicalities, the utility of the Eleventh Circuit's holding is nevertheless apparent in the situation at bar. The fact that Smith's statement was voluntarily given may well have meant that she only casually offered the information in order to be helpful and did not attach the level of consequence to it that

has proven to ultimately be the case. Had a specific question been posed regarding the status of repairs, the answer might have taken on more significance to Smith, she might have considered the answer more carefully or in a more measured way, and she may have investigated the matter more thoroughly.[8] Thus the purpose and rationale behind this rule is born out in this case.

Also apparent from the record are the differing contentions and viewpoints concerning the repairs made to the properties, such as whether the repairs were temporary or permanent in nature, whether many of the repairs were fully and comprehensively done or whether short cuts were taken, and whether they were performed in accordance with the claim settlement process between the Moultons and St. Paul. And, since Smith excepted "cosmetic" repairs in her email statement, it certainly could be posited that what constitutes a "cosmetic" repair is a grey area subject to differing viewpoints as well. Given these differing contentions, the fact that Smith's statement was not a solicited response takes on added significance.

Finally, there is also significance to the fact that it was not Smith's statement that reached Landmark and Arch's ears but Patti Berry's statement that "all repairs have been completed." Berry's statement is more definitive than Smith's, with no mention of cosmetic repairs. As officials from Landmark and Arch would later state, they would likely have

---

[8] As it stands, there is little on record before the Court to determine Smith's level of knowledge about the Moulton properties or their condition at the time. The record indicates that sometime after the email exchange with Berry, Smith (or at least someone from Fisher-Brown) asked the Moultons regarding the status of repairs, and the Moultons responded that repairs "were made." Doc. 447, Exhibit B-1 at 69-70.

conducted further inquiry had they known that issues remained on the status of repairs. *See* doc. 442, Tab 14 at 121; doc. 447, Exhibit B-18 at 219-220.

## 2. Damage Amount

The Moultons' alleged misrepresentations as to damage amounts from Ivan also stem from Smith's responses to Berry in their email exchange. Specifically, after Smith answered Berry's request for the "5 year loss history," Berry then asked, "[D]o you have the damage $$ from Ivan?" Smith responded:

> We don't have any specific figures. St. Paul is handling the claim on all the properties (not just what we have submitted to you) and they are still working it out. When I spoke to the St. Paul underwriter when we were discussing the non-renewal he did mention that they had reserve set up of 2.2 million for all the properties. If you need anything else please let us know.

Berry in turn forwarded to Landmark and Arch the following statement: "[T]he total loss (on the master program which includes several buildings that are not on our schedule – total loss was estimated @ $2.2MM)."

As the Court understands it, when a claim for damages is first made, the insurer generally inspects the property and then provides an initial assessment of the damages. As part of the process, the insurer may set up a "reserve" out of which temporary or emergency repairs may be accomplished. Then, the insured may make a claim for damages, in this instance in the form of a Proof of Loss Statement, that is different from the insurer's damage

assessment. From that point the parties may agree upon a final settlement of the claim amount.

Landmark and Arch contend that at the time of the email exchange, Fisher-Brown should have been in possession of an April 1, 2005, "Loss Run" from St. Paul for the Hurricane Ivan claim which showed the amount "Incurred" as $3,570,677.23. The Loss Run also showed the "Reserve" amount on the claim to be $1,684,801.81 and the "Paid" amount to be $1,885,875.42. The "Loss Run" contains little narrative or explanatory information as it is simply a spreadsheet document. Thus, it is not entirely clear what the three amounts represent, though the "Incurred" amount appears to reflect that the Moultons had claimed, and/or St. Paul had accepted, that the amount of damage to the properties had increased beyond the 2.2 million dollar amount to over 3.5 million dollars.

Landmark and Arch also point to Proof of Loss Statements that the Moultons submitted to St. Paul in May of 2005, which they claim Fisher-Brown possessed at the time. In these, the Moultons sought coverage in much greater amounts: for the three properties related to the Dennis claim alone, the amount claimed was $3,210,762.94, and the amount for all the properties was over 12 million dollars.

There is no direct evidence to show that Smith was aware of either the Loss Run or the Proof of Loss Statements at the time of the emails, but evidence does indicate that these documents were sent to the Fisher-Brown office. Testimony from the Moultons indicates that Gene Laird, the Fisher-Brown agent with whom the Moultons had a long-standing

relationship, was involved in the Ivan claim but would not have specific information about property damage amounts.[9]

Although the ultimate amount of the settlement was significantly higher than the 2.2 million dollar figure Smith conveyed, Smith's statement cannot be deemed a misrepresentation. By stating that she did not have "any specific figures,"[10] that the parties were still "working it out" as far as the claim, and that St. Paul had a "reserve set up of 2.2 million" dollars, Smith plainly indicated that the Moultons and St. Paul were still involved in the process of settling the claim. It is entirely likely that the 2.2 million dollar figure was an accurate reflection of St. Paul's position at the time; after all, as Smith revealed, she gathered the figure directly from one of St. Paul's agents.[11] Moreover, by stating that the 2.2 million dollars was a "reserve" amount, Smith further suggested that this amount was not a final figure but was subject to change throughout the settlement process. Hence, on its face it could hardly be said that the $2.2 million was a reliably accurate figure for Landmark and Arch's purposes, and Smith adequately disclosed this fact.[12] Although the Loss Run and the

---

[9] James Moulton testified that Laird knew about the damages that had been caused to the properties but no damage amounts were discussed. Doc. 447, Exhibit B-2 at 55; *see also* Exhibit B-7 at 20 (deposition of Gene Laird). Laird and Smith were essentially the two Fisher-Brown employees working on the claim.

[10] Given the claim process described above, Berry's question, "[D]o you have the damage $$ from Ivan?" seems imprecise. Nonetheless, it would appear from Smith's response that she took the question to ask for the final settlement amount on the claim.

[11] In fact, this reserve amount is greater than the amount listed on the Loss Run, which suggests that St. Paul likely increased the reserve amount as the claim process progressed.

[12] Landmark and Arch generally assert that the amount of damage to the properties served as an economic indicator of how prone the properties might be to damage in the future, thus affecting the pricing of the policy.

Proof of Loss Statements might have provided further information on the damage amounts, they themselves were not definitive as to the amount of a damages, either. Paramount here is the fact that at the time the parties were still attempting the settle the claim, and so the variance in amounts, which could have resulted in a wide variance in the final amount of the claim, only serves to underscore that Smith had no "specific figures." Amidst this uncertainty, it cannot be said that Smith was misrepresenting the damage situation at the time, much less intentionally so. Furthermore, the message that Smith conveyed to Berry was once again not the same as what Berry then conveyed to Landmark and Arch. Specifically, where Smith described her damage amount in non specific or uncertain terms, Berry's stated that the "total loss was estimated @ $2.2MM," which portrayed the amount with more certainty. In doing so, she glossed over the fact that the $2.2 million figure was only a reserve amount. This is significant because, as officials from Landmark and Arch stated, they would not have written the policy without further investigation had they known that the $2.2 million was only a reserve number and that the Moultons and St. Paul had not yet reached an agreement on the damage amount. Doc. 442, Tab 10 at 127-28; Tab 11 at 159-60.

Accordingly, the Court concludes that the Moultons made no material misrepresentations, nor did they intend to do so, either directly or through the agency of Fisher-Brown, that would have caused Landmark or Arch to decline to issue a policy or otherwise change its terms.

### *MISREPRESENTATION AND FRAUD AFTER HURRICANE DENNIS*

Landmark and Arch also move for summary judgment on grounds that, after Hurricane Dennis and continuing through the commencement of this litigation and into the discovery process, the Moultons engaged in misrepresentations concerning the extent of damage to the properties, the amounts of the losses, and the extent of repairs made to the properties. They claim this voids any coverage under the policy since it violates the contract's fraud provision provided *supra*.

This claim is not properly before the Court as it was neither pled in Landmark's Complaint for Declaratory Relief nor in Arch's Petition for Declaratory Judgment. Docs. 1, 54. Landmark and Arch sought rescission of the policies only on grounds that the Moultons made misrepresentations during the policy underwriting process and before the arrival of Hurricane Dennis. Moreover, Landmark and Arch's claims to this point invoked Section 627.409, which by its terms pertains only to misrepresentations made during the claim writing process. Hence, Landmark and Arch's claim of post-claim misrepresentation would survive only as a common law cause of action. As this Court held earlier in this case, application of Section 627.409 eliminated the common law cause of action in this case, and neither party has moved to reconsider that portion of the Court's Order or otherwise disturb its holding. Doc. 335 at 6-8.

Furthermore, the Court notes that the general rule in Florida is that forfeitures of insurance policies are not favored, especially after the event that would give rise to the insurer's liability has already occurred. *Boca Raton Community Hosp., Inc v. Brucker*, 695 So.2d 911, 912-13 (Fla. 4th DCA 1997) (citing *LeMaster v. USAA Life Ins. Co.*, 922 F.Supp. 581, 585 (M.D. Fla. 1996). The reasoning for this rule seems the same as that expressed by the Eleventh Circuit in *William Penn*, *supra*, to dissuade insurers from making 'Monday morning quarterback' type attempts to unearth erroneous information in order to void a policy. The Court does not hereby find Landmark and Arch guilty of this undertaking. Nevertheless, as experts and eyewitnesses from Landmark and Arch have assessed the repairs that were made to the properties pre-Dennis as less than complete, and as the Moultons continue to assert in opposition that the properties were in fact "repaired," it seems clear that many issues persist, such as: whether some of the repair work should be deemed a temporary repair; whether such repairs should be acceptable if structurally sound or otherwise sufficient under the circumstances; whether properties were or should have been deemed a total loss, for both damage assessment and repair purposes; whether James Moulton, who performed or directed all or most of the repairs himself, took shortcuts in those repairs in order to cut costs; whether those shortcuts should have been accounted for in the claim settlement with St. Paul; whether that should affect the status or amount of the Moultons' claim with St. Paul and consequently with Landmark and Arch; and whether some of these practices constitute

an attempt by the Moultons to collect twice (once for Ivan, once for Dennis) on essentially the same destructive event.

As these issues have emerged following Hurricane Dennis's aftermath, the policy rescissions, and then this litigation, with all of the resultant discovery issues, arguments made and positions taken, it would be difficult to conclude that the Moultons are perpetrating an ongoing fraud. While the Court does not foreclose the possibility that during this time frame a fraud sufficient to justify rescission of the policy could yet be proven, it would be incumbent upon Landmark and Arch to show that a finding of fraud in the context of an ongoing litigation would comport with Florida and Federal law and not be better served, for instance, in the region of sanctions under Rule 11. In any event, the fact that the issue is simply not properly before the Court forecloses the claim at its inception.[13]

Although not critical to the outcome, one final matter to be addressed is the Moultons' motion in limine which seeks to exclude much of the documentation dealing with property damage issues that was collected or produced during the processing of claims from both hurricanes. The Moultons assert that, since these documents on the whole were integral to the process of settling their insurance claims, they should be excluded under Federal Rule of Evidence 408 because they were part of settlement negotiations. In relevant part, Rule 408 precludes the admission of "conduct or statements made in compromise negotiations regarding the claim . . . ." Fed. R. Evid. 408(2). However, this rule does not serve to exclude

---

[13] The Court also notes that, perhaps in recognition of the above, Landmark and Arch provide little in the way of legal analysis for this particular claim, nor do they devote much space for its argument.

evidence simply because it is presented during the course of compromise negotiations. *See Ramada Development Co. v. Rauch*, 644 F.2d 1097, 1107 (5th Cir. 1981). If this were not the case, parties would be able to "immunize" evidence from use merely by including them during negotiations. *Id.* What is required under the rule is for the evidence to have been produced for the settlement negotiation with the intention that it help produce a compromise. *Id.* Further, settlement offers made in one case may not be excluded when they become relevant in another case. *See Vulcan Hart Corp. v. National Labor Relations Board*, 718 F.2d 269, 277 (8th Cir. 1983); *Agan v. Katzman & Korr, P.A.*, 328 F. Supp. 2d 1363, 1372-73 (S.D. Fla. 2004); *see also Broadcort Capital Corp. v. Summa Medical Corp.*, 972 F.2d 1183, 1194 (10th Cir. 1992). Ultimately, the court weighs the utility of such evidence against the potential that admission of the evidence might serve to discourage future settlement negotiations. *Rauch*, 644 F.2d at 1107.

In sweeping fashion, the Moultons attempt to exclude all documents simply by their association with the insurance claim process. As case law demonstrates, more is required. Were the Moultons to have shown how particular documents were indeed produced for the purpose of achieving settlement, their exclusion might be possible, but the Moultons do not make a case for any particular document. Further, many of the documents in this case relate to settlements of the Hurricane Ivan claim, which may not be excluded in this litigation over their Hurricane Dennis claim. Accordingly, the motion is without merit.

***BREACH OF INSURANCE POLICY FOR FAILURE TO PROVIDE COVERAGE***

The Court now turns to the summary judgment motion filed by the Moultons. In their third amended counterclaim, the Moultons claim that Landmark and Arch breached the insurance policy contract by failing to compensate them for their property losses caused by Hurricane Dennis. Doc. 248. Obviously, this claim stems from the fact that Landmark and Arch opted to file the instant action seeking declaratory relief before proceeding further on the claim.

The purpose of a declaratory judgment is to allow litigants to determine an actual controversy before it ripens into a violation of law or, as here, a breach of a contractual duty.[14] *Disabled in Action of Pennsylvania v. Southeastern Pennsylvania Transp. Authority*, 539 F.3d 199, 215 (3rd Cir. 2008); *Hardware Mut. Cas. Co. v. Schantz*, 178 F.2d 779, 780 (5th Cir. 1949); *see also* 10B C. Wright & A. Miller, Federal Practice & Procedure, Civil 3d § 2751 (2004). That purpose would be defeated if Landmark and Arch, by the very act of trying to secure their rights, and now having the Court's ruling, were not allowed to conduct themselves in accordance with it. Stated more simply, Landmark and Arch should be allowed to administer the claim now that the Court has ruled that they are unable to rescind it. *See Moynihan v. West Coast Life Ins. Co.*, 607 F.Supp.2d 1336, 1339 (S.D. Fla. 2009);

---

[14]  The Declaratory Judgment Act, 28 U.S.C. § 2201 states in relevant part that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

*see also* Pittman v. Cole  267 F.3d 1269, 1278 (11th Cir. 2001)(stating that in determining ripeness issue courts should consider whether judicial rulings would inappropriately intrude upon further administrative action).

Indeed, the court surmises that the instant Order may place this case in a new posture and may even provide the parties a fresh perspective.  To this point, nearly all of the focus has been upon issues and events during the underwriting process and before Hurricane Dennis.  While the Court today resolves the rescission issues that were presented, it remains evident that the issue of repairs has not been laid to rest, at least as to how it might affect calculations of damage amounts.  Certainly, repairs were not conducted in the manner or to the extent that Landmark and Arch may have assumed at the time, and the Court wishes to emphasize in this regard that it has rendered no opinion on whether coverage yet exists under the policy, or in what quantities, for those aspects of property repair that might have been lacking.  The point is that now the parties are positioned to properly administrate the Hurricane Dennis claim and determine the extent of the Moultons' coverage.  Hence, the Moultons' counterclaim for breach of contract is not ripe.

## IV.  SUMMARY

The Court's ruling in this matter may be summarized as follows, and **IT IS HEREBY ORDERED**:

1.    The Motion for Judgment on the Pleadings filed by Defendant/Counter-Plaintiff Moulton Properties, Inc., et al., (doc. 436) is **DENIED**.

2.      The Revised Motion in Limine filed by Defendant/Counter-Plaintiff Moulton Properties, Inc., et al. (doc. 460) is **DENIED**.

3.      The Motion for Partial Summary Judgment filed by Defendant/Counter-Plaintiff Moulton Properties, Inc., et al., (doc. 437) is **GRANTED** to the extent that the Complaint for Declaratory Relief filed by Plaintiff/Counter-Defendant Landmark American Insurance Company (doc. 1) and the Petition for Declaratory Judgment filed by Intervenor/Plaintiff/Counter-Defendant Arch Insurance Group (doc. 54) are **DISMISSED** in their entirety as detailed in this Order; the Motion for Partial Summary Judgment is **DENIED** in all other respects.

4.      Consistent with this Order, the Clerk of Court is directed to enter summary judgment in favor of Defendant/Counter-Plaintiff Moulton Properties, Inc., et al., as it pertains to the Complaint for Declaratory Relief filed by Plaintiff/Counter-Defendant Landmark American Insurance Company (doc. 1) and the Petition for Declaratory Judgment filed by Intervenor/Plaintiff/Counter-Defendant Arch Insurance Group (doc. 54). Plaintiff/Counter-Defendant Landmark American Insurance Company and Intervenor/Plaintiff/Counter-Defendant Arch Insurance Group shall take nothing further by this action and shall go without day.

5.      The Motions for Summary Judgment filed by Plaintiff/Counter-Defendant Landmark American Insurance Company ("Landmark") (doc. 451) and Intervenor/Plaintiff/Counter-Defendant Arch Insurance Group ("Arch") (doc. 450) are **GRANTED** to the extent that the Third Amended Counterclaim filed by Defendant/Counter-Plaintiff Moulton Properties, Inc., et al., (doc. 248) is **DISMISSED** in its entirety as detailed in this Order; the Motions for Summary Judgment are **DENIED** in all other respects.

6.      Consistent with this Order, the Clerk of Court is directed to enter summary judgment in favor of Plaintiff/Counter-Defendant Landmark American Insurance Company and Intervenor/Plaintiff/Counter-Defendant Arch Insurance Group as it pertains to the Third Amended Counterclaim filed by Defendant/Counter-Plaintiff Moulton Properties, Inc., et al., (doc. 248). Defendant/Counter-Plaintiff Moulton Properties, Inc., et al., shall take nothing further by this action and shall go without day.

7.      Any and all other pending motions are **DENIED** as moot.

8.      The Clerk of Court is directed to close this case.

**ORDERED** on this 22nd day of September, 2009.


_____
s/*L.A. Collier*
Lacey A. Collier
Senior United States District Judge
